1  Andrew Wolff, State Bar No. 195092
   Chris Beatty, State Bar No. 250040
2  Sheena Patel, State Bar No. 297008
   LAW OFFICE OF ANDREW WOLFF, PC
3  1970 Broadway Street, Suite 210
   Oakland, California 94612
4  (510) 834-3300 Office
   (510) 834-3377 Facsimile
5

6  Attorney for Qui Tam Plaintiff
   SONDRA MADDEN
7

**FILED**

**Dec 10, 2015**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

SACRAMENTO DIVISION

11  UNITED STATES OF AMERICA *ex*
    *rel.* SONDRA MADDEN and
12  SONDRA MADDEN,

Case No.:  2:15-cv-00195-KJM CKD

13                    Plaintiff,

**FIRST AMENDED COMPLAINT FOR
DAMAGES;**

14

15  vs.

**FILED UNDER SEAL
31 U.S.C. §§ 3729-32 et. seq.**

16  LEATHA HENDERSON,
    individually and as Trustee of the
17  Leatha Henderson Trust, and DOES
    1-30,
18

**JURY TRIAL DEMANDED**

19                    Defendants.

20        Qui tam Plaintiff, SONDRA MADDEN, hereby demands a trial by jury. Qui tam Plaintiff,

21  SONDRA MADDEN alleges as follows:

22                    **PRELIMINARY STATEMENT**

23        Qui tam plaintiff SONDRA MADDEN is a mother of three minor children who resides in

24  Sacramento, CA. Plaintiff SONDRA MADDEN is a person who suffers from cognitive and

25  physical disabilities as defined by law in that she suffers from severe bipolar disorder among

26  other physical and cognitive disabilities. At the times hereinafter mentioned plaintiff SONDRA

27  MADDEN's sole sources of income was public assistance totaling approximately $1,035.00 per

28  month. Because of her extremely limited income, she is eligible for rental assistance through the

1   federal rent subsidy program known as the Housing Choice Voucher Program, more commonly

2   known as Section 8.

3          The Section 8 program provides that a participating tenant, renting privately-owned

4   housing, pays generally between 30 and 40 percent of their adjusted monthly income toward the

5   rent and utility costs, while the Plaintiffs, the federal government, through the local housing

6   agencies pays the balance of the rent directly to the owner. Defendants were parties to the lease

7   agreements with the Plaintiffs' and a Housing Assistance Payments Contract with the

8   Sacramento County Housing & Redevelopment Agency subsidized by the Section 8 program.

9   Defendants then violated federal law by demanding from the Plaintiff additional monthly rental

10  payments, in addition to the share under the lease and threatening to evict Plaintiff if she did not

11  comply.  The Defendants actions caused the Plaintiff to suffer economic harm and suffer

12  emotional distress.

13         This action is brought under the United States False Claims Act, 31 U.S.C. §§3729, et

14  seq.  Plaintiff's seek all and any statutory share of any award made to the United States.  Plaintiff

15  seeks all remedies available due to the Defendant's breach of contact.  The United States seeks

16  all remedies available under the Federal False Claims Act.

17                                       **PARTIES**

18         1.     At all times herein relevant, Plaintiffs, SONDRA MADDEN (hereinafter,

19  **"Plaintiff"**), was a tenant of the Defendants at the premises located at 4620 Galbrath Dr.

20  Sacramento, CA 95842 (hereinafter "Subject Premises").

21         2.     Plaintiff the United States of America is *ex rel.* SONDRA MADDEN.

22         3.     Plaintiffs are informed and believe, and thereon allege, that LEATHA

23  HENDERSON, individually and as Trustee of the Leatha Henderson Trust, and DOES 1-30,

24  (hereinafter "Defendants"), owned, controlled, and/or managed the unit that Plaintiffs resided in

25  during all relevant periods of time in this complaint.  Defendants named herein were the owners

26  and/or property managers or the agents and/or employees of the owners and/or property managers

27  of the Subject Premises during all time periods relevant herein.

28         4.     Defendants DOES 1-30 are individuals and/or business entities doing business in

United States, et al., v. Henderson, et al.
First Amended Complaint for Damages, Jury Trial Demanded; Case No: 2:15-cv-00195-KJM CKD          -2-

1   the County of Sacramento and/or who are contracted to do work in the County of Sacramento.

2   Each and every Defendant was at all relevant time the agents and/or employees of other

3   Defendants and acted within the scope of said agency and/or employment.  Plaintiffs do not

4   know the true names of Defendants identified as DOES 1-30, but will seek leave to amend this

5   complaint if and when Plaintiffs discover the identity of any of the Defendants now sued under

6   the fictitious names DOES 1-30. At all times herein relevant, Plaintiffs,

7                                   **JURISDICTION**

8       5.      This court has federal subject matter jurisdiction because Plaintiffs bring this

9   Complaint pursuant to the United States False Claim Acts, 31 U.S.C. §§ 3729 et seq.

10      6.      Venue is proper in this court because Defendants do business in its jurisdictional

11  area, and the damage to Plaintiffs, as well as the making of the contracts which are the subject of

12  this action, occurred within its jurisdictional area.

13                **HOUSING CHOICE VOUCHER PROGRAM (SECTION 8)**

14      7.      The Section Housing Choice Voucher Program is a federal program intended to

15  assist low-income families in obtaining decent, safe, sanitary and affordable housing and is

16  authorized by the Section 8 of the U.S. Housing Act of 1937, 42 U.S.C. § 1437f. Regulations

17  governing the Section 8 program are contained in 24 C.F.R. Part 982.

18      8.      The pertinent federal regulations promulgated to implement the Act provide that

19  under the Section 8 Housing Choice Voucher Program, a tenant family enters into a lease with a

20  landlord/owner that continues until its expiration or termination by the owners, the participant

21  family, or by the public housing agency (PHA).  Generally, participants pay 30 to 40 percent of

22  their adjusted monthly income, toward the rent and utilities, while the PHA pays the balance.  24

23  C.F.R. Part 982.

24      9.      The United States Department of Housing and Urban Development ("HUD")

25  administers the program.

26      10.     HUD enters into annual contribution contracts with the public housing agencies

27  such as Sacramento Housing & Redevelopment Agency ("SHRA').

28      11.     Pursuant to an annual contribution contract, the public housing agency ("PHA")

1  may enter into a HUD form contract known as a Housing Assistance Payments Contract ("HAP")

2  with the landlord of a dwelling unit to make monthly housing assistance payments on behalf of

3  an eligible tenant family.

4        12.    In a HAP contract the landlord/owner simultaneously enters into a lease for the

5  dwelling unit with the family.  The lease must contain federally-mandated terms or be on a HUD

6  form.

7        13.    The HAP establishes the initial lease term and the initial monthly rent to the

8  landlord.  The landlord may not increase the total rent payable to the landlord during the initial

9  lease term.

10        14.    The HAP also sets out the amount of the housing assistance payment by the PHA

11  to the landlord, calculated in accordance with the regulations.

12        15.    The HAP provides that the tenant is responsible for paying the landlord the

13  balance of the rent not covered by the housing assistance payment.

14        16.    The amount of the PHA's monthly housing assistance payment to the landlord is

15  determined in accordance with HUD regulations for the Section 8 program.

16        17.    The sum of the housing assistance payment and the tenant's share of the rent

17  payable to the landlord is known as the contract rent.

18        18.    The sum of the housing assistance payment and the tenant's share of the rent

19  payable to the landlord may be adjusted due to market factors in the rental market and

20  adjustments a tenant's income.  These adjustments are made in accordance to HUD requirements.

21  Notice of these adjustments to the contract rent are provided to the landlord and tenant by the

22  PHA through a notice called a subsidy adjustment notice ("SAN") .

23                                 **STATEMENT OF FACTS**

24        19.    At all times hereafter mentioned, Plaintiff SONDRA MADDEN was a recipient of

25  housing assistance from SHRA under the Section 8 Program.

26        20.    Plaintiff SONDRA MADDEN is informed and believes, and thereon alleges, that

27  at all relevant times, Defendants were Plaintiff SONDRA MADDEN'S landlords, and Plaintiff

28  SONDRA MADDEN was the tenant of Defendants as those terms, "landlord" and "tenant" are

1 | defined in the HAP contract.

2 |      21.    On or about July 10, 2007 Plaintiff SONDRA MADDEN and the Defendant

3 | reached an agreement for the rental of the Subject Premises, subject to the approval of SHRA.

4 | On or about July 10, 2007 SHRA, Plaintiff SONDRA MADDEN and Defendant approved the

5 | rental agreement and entered into a HAP with the SHRA.  A true and accurate copy of this HAP

6 | agreement is attached to this complaint and incorporated by reference, and marked as **Exhibit A.**

7 | Pursuant to the contract rent for the Subject Premises was $1,330.00, with SHRA agreeing to be

8 | responsible for $831.00 of the contract rent, and Plaintiff SONDRA MADDEN responsible for

9 | $499.00 of the contract rent.

10 |      22.    On or about July 15, 2007 Defendant approached Plaintiff SONDRA MADDEN

11 | and demanded that Plaintiff SONDRA MADDEN pay a higher rental amount than the contract

12 | rent of $1,330.00.  Defendant told Plaintiff SONDRA MADDEN that she could not live at the

13 | Subject Premises unless she paid a higher rental rate than the contract rent.  On or about July 15,

14 | 2007 Defendant demanded that Plaintiff SONDRA MADDEN enter into a different, and back

15 | dated, rental agreement.  Due to this demand Defendant and Plaintiff SONDRA MADDEN

16 | entered into a residential lease on or about July 15, 2007 stating that the Subject Premises rent

17 | would be 1,450.00 per month.  Said rental agreement stated that Plaintiff SONDRA MADDEN

18 | would pay $120.00 more in rent than required by the HAP contact.  A true and accurate copy of

19 | this rental agreement is attached to this complaint and incorporated by reference, and marked as

20 | **Exhibit B.**

21 |      23.    Plaintiff SONDRA MADDEN occupied the Subject Premises leasing this unit

22 | from the Defendant from on or around July 2007 to approximately May 2013.

23 |      24.    During the time that Plaintiff SONDRA MADDEN occupied the Subject

24 | Premises, SHRA would send Defendant and Plaintiff SONDRA MADDEN an annual SAN.  A

25 | true and accurate copy of SHRA's SANs are attached to this complaint and incorporated by

26 | reference, and marked as **Exhibits C, D, E.**

27 |      25.    After Defendant received the SANs, she would notify Plaintiff SONDRA

28 | MADDEN that she would need to pay more money per month for the rent at the Subject

Premises than mandated by SHRA's in the SANs.  A true and accurate copy of the Defendants'
notices to pay more money than mandated by SHRA's in the SANs are attached to this complaint
and incorporated by reference, and marked as **Exhibits F, G, H**.

26.     Defendant also demanded that Plaintiff SONDRA MADDEN enter into rental
agreements which called for more monthly rent to be paid at the Subject Premises than mandated
in the HAP and/or SANs.  A true and accurate copy of two such rental agreements are attached to
this complaint and incorporated by reference, and marked as **Exhibits I and J**.

27.     Throughout Plaintiff SONDRA MADDEN'S tenancy at the Subject Premises, and
due to her participation in the Section 8 Program, SHRA had an annual contribution contract
with HUD pursuant to which HUD provided the money to SHRA to pay housing assistance to
the Defendant on Plaintiff SONDRA MADDEN'S behalf.

28.     In accordance with the HAP contract SHRA paid the Defendant housing
assistance payments in the amounts including, and adjusted upward of pursuant to the SANs, of
$831.00 per month throughout Plaintiff SONDRA MADDENS tenancy from July 2007 through
May 2013.  On information and belief, at all times during Plaintiff SONDRA MADDEN'S
tenancy, SHRA paid the housing assistance payment directly to the Defendant.

29.     Due to the above, Defendant demanded and Plaintiff SONDRA MADDEN paid
$120.00 in additional rental payments from July 2007 through May 2008.  Due to the above,
Defendant demanded and Plaintiff SONDRA MADDEN paid $170.00 in additional rental
payments from July 2008 through April 2013.

30.     The Defendant threatened to evict Plaintiff SONDRA MADDEN and her family
if she did not pay these additional rental amounts.

31.     Plaintiff SONDRA MADDEN made a total of 70 additional and/ or illegal rental
payments to Defendant totaling $11,300.00.  HUD and SHRA made a total of 70 rental payments
to the Defendant totaling $60,049.00.

32.     Neither the SHRA nor HUD authorized the Defendant to charge or collect money
for additional rental payments.

33.     The Defendant never informed Plaintiff SONDRA MADDEN that the HAP and

1   Section 8 rules prohibit her from seeking these additional rent payments from her.  Due to

2   Defendants demands and threats of eviction Plaintiff SONDRA MADDEN acquiesced to the

3   Defendants' demands for additional rental payments so that she not lose her home and/or Section

4   8 voucher.

5          34.     Due to the above, on or about May 1, 2013, Plaintiff SONDRA MADDEN

6   vacated the Subject Premises.

7          35.     Plaintiffs suffered emotional distress, over-payment of rent, and out-of-pocket

8   expenses as a result of the aforementioned conduct and other acts and/or omissions committed by

9   Defendants.

10                         **FIRST CAUSE OF ACTION**
                  **VIOLATION OF THE FEDERAL FALSE CLAIMS ACT**
11                             **31 U.S.C. § 3729(a)**
                            **(All Plaintiffs v. All Defendants)**
12         36.     Plaintiffs re-allege and incorporate into this cause of action the allegations of

13  paragraphs 1 through 35, as if the same were set out at length herein.

14         37.     The False Claims Act ("FCA") provides that any person who "knowingly presents

15  a false or fraudulent claim for payment or approval" to the United States is liable on each such

16  claim for a civil penalty of not less than $5,000.00 and not more than $10,000.00, plus three

17  times the amount of damages sustained by the United States.  In addition, any person who

18  violates the FAC is liable for the costs of the civil action brought to recover such penalty of

19  damages. 31 U.S.C. §3729(a).

20         38.     The FCA defines the term "knowing" and "knowingly" as meaning, with respect

21  to information, that a person "(1) has actual knowledge of the information; (2) acts in deliberate

22  ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or

23  falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C.

24  §3729(b).

25         39.     The FAC defines a "claim" as "any request or demand....for money or property

26  which is made to a contractor, grantee, or there recipient of the United States Government

27  provided that any portion of the money or property which is requested or demanded, or if the

28

1  Government will reimburse such contractor, grantee or other recipient for any portion of the

2  money or property which is requested or demanded."

3      40.   For each of the 70 months that the Defendant accepted the "additional rent

4  payments" from Plaintiff SONDRA MADDEN, the Defendant endorsed and presented for

5  payment the housing assistance checks received from the SRHA.

6      41.   Defendant agreed in Part B paragraph 6 of the HAP contract (Exhibit A of this

7  complaint) that "During the HAP contract term, the rent to owner may at no time exceed the

8  reasonable rent for the contract unit as most recently determined or redetermined by the PHA in

9  accordance with HUD requirements."

10     42.   Defendant agreed in Part B paragraph 8 of the HAP contract (Exhibit A of this

11  complaint) that "During the term of this contact, the owner certifies that:......d. Except for the rent

12  to owner, the owner has not received and will not receive any payment or other consideration

13  (from the family, the PHA, HUD, or any other public or private source) for rental of the contract

14  unit during the HAP contract term," and further agreed on Part C, paragraphs 5 e. and f.: "e. The

15  owner may not may not charge or accept, from the family or from any other source, any payment

16  for rent of the unit in addition to the rent to owner.  Rent to owner includes all housing services,

17  maintenance, utilities and appliances to be provided and paid by the owner in accordance with

18  the lease.  f. The owner must immediately return any excess rent payment to the tenant."

19     43.   Defendant knowingly endorsed and presented for payment 70 separate housing

20  assistance checks totaling $60,049.00 while receiving additional payments in violation of the

21  HAP contract from Plaintiff SONDRA MADDEN totaling $11,300.00.

22     44.   Defendants' endorsement and presentation for payment of each assistance check

23  for each month while, she knowingly received "additional rent payments" from Plaintiff

24  SONDRA MADDEN constitutes a separate false claim or representation against the United

25  States that she did not receive any other consideration for the rented premises for that month, as

26  set forth in the HAP contact.

27     45.   The United States of America suffered damages as a result of violations of the

28  False Claims Act, because the money which HUD disbursed to SRHA for the payment of Section

1    8 housing assistance would not have been paid to the Defendant absent her false claims and

2    fraud.

3          46.      The United States of America sustained damages equal to all payments made to

4    the Defendant pursuant to Plaintiff SONDRA MADDEN's Section 8 assistance program, for

5    which the Defendant also received "additional rent payments" from Plaintiff SONDRA

6    MADDEN, totaling $60,049.00.

7

8                           **SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT - CAL. CIVIL CODE §3300 et seq.**
**(All Plaintiffs v. All Defendants)**

9          47.      Plaintiff SONDRA MADDEN re-allege and incorporate into this cause of action

10    the allegations of paragraphs 1 through 46, as if the same were set out at length herein.

11          48.      Plaintiff SONDRA MADDEN and Defendants entered into a written residential

12    rental agreement. Defendants were obligated to perform under the terms of this agreement.

13    Plaintiffs performed or was excused from performing their obligations under the contract.

14          49.      Defendants breached the terms of said agreement on multiple occasions during the

15    term of preceding the filing of this complaint by charging Plaintiff SONDRA MADDEN

16    additional rental payments in excess of the HAP contract.

17          50.      As a result of all Defendants' conduct Plaintiffs' suffered damages including

18    overpayment of rent, out of pocket expenses, physical and mental discomfort, and other damages

19    to be ascertained at trial.

20          51.      Wherefore Plaintiffs pray for the damages stated below.

21                       **THIRD CAUSE OF ACTION**
**UNFAIR BUSINESS PRACTICE - VIOLATION OF CALIFORNIA BUSINESS**

22                   **AND PROFESSIONS CODE §§17200, et seq., 17500**
**(All Plaintiffs v. All Defendants)**

23

24          52.      Plaintiff SONDRA MADDEN  re-allege and incorporate into this cause of action

the allegations of paragraphs 1 through 51, as if the same were set out at length herein.

25

26          53.      Plaintiffs brings this cause of action on Plaintiffs' own behalf, on behalf of all

persons similarly situated, and on behalf of the People of the State of California.

27

28          54.      By reason of Defendants' failure to comply with federal and local law for the

1   management of real property, Defendants' conduct constitutes an unfair business practice under

2   California Business and Professions Code §17200, et seq., and Business and Professions Code

3   §17500.

4        55.   Plaintiffs are informed and believe and thereon allege that it is the regular practice

5   of Defendants to intentionally disregard the rights of tenants and violate applicable laws relating

6   to tenancies in their buildings in ways that include, but are not limited to, illegally collecting

7   rents.

8        56.   At all times herein relevant, Defendants were conducting business under the laws

9   of the United States of America. In conducting said business, Defendants were obligated to

10  comply with the laws of the United States of America.

11       57.   As a direct and proximate result of Defendants' conduct, Defendants have accrued

12  unjust enrichment by way of illegally collected rents.

13       58.   Wherefore Plaintiffs pray for the restoration of the overpayments in rents and

14  damages stated below.

### FOURTH CAUSE OF ACTION
### NEGLIGENT PROPERTY MANAGEMENT
#### (All Plaintiffs v. All Defendants)

15

16       59.   Plaintiff SONDRA MADDEN  re-allege and incorporate into this cause of action

17  the allegations of paragraphs 1 through 58, as if the same were set out at length herein.

18       60.   Defendants owned and/or were otherwise responsible for the management and

19  property management at the Subject Premises had an obligation to ensure the Subject Premises

20  was and/or is managed in a manner that is in compliance with the law.

21       61.   The Defendants who managed the property owed Plaintiffs, as their tenants and/or

22  as parties who were subsidizing the rental contract, the duty to manage the Subject Premises and

23  to perform their duties at the Subject Property in a reasonable and lawful manager.  Defendants

24  breached their duties failing adequately manage the Subject Premises in compliance with federal

25  law and regulations.  Plaintiffs suffered harm due to said breach to their property in an amount to

26  be determined at trial.

27       62.   As a result of Defendants' conduct, Plaintiffs suffered damages, including

28

1   economic damages in an amount to be ascertained at trial.

2         63.     Wherefore Plaintiff pray for the damages stated below.

3   **FIFTH CAUSE OF ACTION**
**PAYMENT BY MISTAKE**
4   **(All Plaintiffs v. All Defendants)**
      64.     Plaintiff SONDRA MADDEN re-alleges and incorporates into this cause of action

5   the allegations of paragraphs 1 through 63, as if the same were set out at length herein.

6         65.     Plaintiffs paid Defendants payments and/or money by mistake for rental of the

7   Subject Premises.  Said payments were caused in fact by Defendants statements,

8   misrepresentations or mistakes and/or acts.

9         66.     Defendant did not have right to said payments and/or money.  Due to the above

10   described conduct of the Defendant Plaintiff SONDRA MADDEN made a total of 70 rental

11   payments to Defendant totaling $11,300.00 by mistake.  Moreover, HUD and SHRA made a total

12   of 70 rental payments to the Defendant totaling $60,049.00 by mistake.

13         67.     Plaintiffs have asked that Defendant return said payments and/or money.

14         68.     The Defendant has not returned the payments and/or money to the Plaintiffs; and

15         69.     Wherefore Plaintiffs pray for the damages stated below.

16

17   **PRAYER**
WHEREFORE Plaintiffs SONDRA MADDEN, and the United States of America

18   respectfully request the following relief:

19         A.     Find that the Defendant violated the False Claims Act and is liable to the

20   United States of America;

21         B.     Assess a civil penalty against the Defendant for each separate violation of

22   the False Claims Act in the amount of not less than $5,000.00 or more than $10,000.00;

23         C.     Award the United States three times the amount of damages that it

24   sustained as a result of the Defendants act;

25         D.     Award Plaintiff SONDRA MADDEN the *qui tam* Plaintiff's share of the

26   proceed or settlement;

27         E.     Award Plaintiff United States of America, and/or Plaintiff SONDRA

28

1    MADDEN costs and reasonable attorneys fees pursuant to contract and the False Claims Act;

2              F.     That the Court Order the Defendant to cease and desist from violating the

3    Federal False Claims Act;

4              G.     Treble damages according to proof for each cause of action;

5              H.     For general damages according to proof for each cause of action;

6              I.     For compensatory damages for losses resulting from humiliation, mental

7    anguish, and emotional distress according to proof;

8              J.     For incidental expenses, past, present and future;

9              K.     For any and all unjust enrichment which this Court deems just and proper;

10             L.     For any and all damages made through payment by mistake;

11             M.     For interest on the amount of losses incurred at the prevailing legal rate;

12             N.     For statutory penalties;

13             O.     For such other and further relief which this Court deems just and proper.

14

15   Dated: December 10, 2015              LAW OFFICES OF ANDREW WOLFF, PC

16

17                                         CHRIS BEATTY, ESQ
                                           Attorney for Plaintiff
18                                         SONDRA MADDEN

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 07/31/2007)

---

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**

   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**

   SONDRA MADDEN

3. **Contract Unit**

   4620 GALBRATH DR
   SACRAMENTO, CA  95842

4. **Household**
   The following persons may reside in the unit.  Other persons may not be added to the household without prior written approval of the owner and the PHA.

   SONDRA  MADDEN
   DALE  MADDEN, JR.
   DALEMARK  MADDEN, III
   MARCUS  SHIOYA BRITTER
   KIANTE  MADDEN

5. **Initial Lease Term**
   The initial lease term begins on: 06/25/2007
   The initial lease term ends on: 05/31/2008

6. **Initial Rent to Owner**
   The initial rent to owner is: $1330
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**
   The HAP contract term commences on the first day of the inital lease term.  At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $831 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is  subject to change during the HAP contract term in accordance with HUD requirements.

---

8.    Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | |
|---|---|---|
| | Owner | Tenant |
| Refrigerator | | T |
| Flat Fee Electric | | T |
| Sewer | O | |
| Trash Collection | O | |
| Range/Microwave | O | |
| Air Conditioning | | T |
| Water Heat - Natural Gas | | T |
| Water | O | |
| Heating - Oil/Electric | | T |
| Cooking Oil/Electric | | T |
| Other Electric | | T |

Signatures

Public Housing Agency:  Sacramento Housing Authority

Signature

Sylvia DeLeon
Print or Type Name and Title of Signatory

7-10-07
Date (mm/dd/yyyy)

Owner: LEATHA HENDERSON

Signature

LEATHA B HENDERSON
Print or Type Name and Title of Signatory

July 9, 2007
Date (mm/dd/yyyy)

Mail Payments to:

LEATHA HENDERSON
Name

2264 MENALTO AVENUE
E PALO ALTO, CA  94303

Address (Street, City, State, Zip)

Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

Case 2:15-cv-00195-KJM-DB   Document 12   Filed 02/10/15   Page 16 of 66

OMB Approval No. 2577-0169
(exp. 07/31/2007)

## Part B of HAP Contract: Body of Contract

1. **Purpose**

    a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

    b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

    c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

    d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**

    a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

    b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

    c. The lease for the contract unit must include word- for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

    d. The owner certifies that:

    (1) The owner and the tenant have entered into a   lease of the contract unit that includes all   provisions of the tenancy addendum.

    (2) The lease is in a standard form that is used in   the locality by the owner and that is generally   used for other unassisted tenants in the   premises.

    (3) The lease is consistent with State and local   law.

    e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**

    a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

    b. The owner must provide all utilities needed to comply with the HQS.

    c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies

for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

    d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

    e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

    f. The PHA must notify the owner of any HQS defects shown by the inspection.

    g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**

    a. Relation to lease term. The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

    b. When HAP contract terminates.

    (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

    (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

    (3) If the family moves from the contract unit, the HAP contract terminates automatically.

    (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

    (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

(6) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(7) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(8) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. Provision and Payment for Utilities and Appliances

   a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

   b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

   c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. Rent to Owner: Reasonable Rent

   a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

   b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

      (1) The location, quality, size, unit type, and age of the contract unit; and

      (2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

   c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

   d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. PHA Payment to Owner

   a. When paid

      (1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

      (2) The PHA must pay housing assistance payments promptly when due to the owner.

      (3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term , the PHA shall pay the owner penalties in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment by a

tenant. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

      (4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

   b. Owner compliance with HAP contract. Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

   c. Amount of PHA payment to owner

      (1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

      (2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

      (3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

   d. Application of payment. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   e. Limit of PHA responsibility.

      (1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

      (2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

   f. Overpayment to owner. If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. Owner Certification

During the term of this contract, the owner certifies that:

   a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9. **Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

10. **Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

11. **PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

12. **Exclusion of Third Party Rights.**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

### 13. Conflict of Interest

a. "Covered individual" means a person or entity who is a member of any of the following classes:

   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

### 14. Assignment of the HAP Contract

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

   (2) A court or administrative agency has determined that the owner or proposed new owner violated

the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

   (1) Has violated obligations under a housing assistance payments contract under Section 8;

   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

      (a) Threatens the right to peaceful enjoyment of the premises by other residents;

      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

      (d) Is drug-related criminal activity or violent criminal activity;

   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

### 15. Written Notices. Any notice by the PHA or the owner in connection with this contract must be in writing.

### 16. Entire Agreement: Interpretation

a. The HAP contract contains the entire agreement between the owner and the PHA.

b. The HAP contract shall be interpreted and implemented in accordance with HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

# Housing Assistance Payments Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 07/31/2007)

## Part C of HAP Contract: Tenancy Addendum

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

a. Maintenance

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
      (a) Pay for any utilities that are to be paid by the tenant.
      (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**
   a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.
   b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
      (4) Other good cause (as provided in paragraph d).

   c. **Criminal activity or alcohol abuse.**
      (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
         (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
         (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
         (c) Any violent criminal activity on or near the premises; or
         (d) Any drug-related criminal activity on or near the premises.

      (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
         (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
         (b) Violating a condition of probation or parole under Federal or State law.

      (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

      (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

   d. **Other good cause for termination of tenancy**
      (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
      (2) During the initial lease term or during any extension term, other good cause includes:
         (a) Disturbance of neighbors,
         (b) Destruction of property, or
         (c) Living or housekeeping habits that cause damage to the unit or premises.
      (3) After the initial lease term, such good cause includes:

         (a) The tenant's failure to accept the owner's offer of a new lease or revision;
         (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
         (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

   e. **Protections for Victims of Abuse.**
      (1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of a victim.
      (2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.
      (3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or

the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of

f. **Eviction by court action.** The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

If the HAP contract terminates for any reason, the lease terminates automatically.

## 10. PHA Termination of Assistance

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11. Family Move Out

The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12. Security Deposit

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the family a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.

HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.

Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

**SACRAMENTO HOUSING & REDEVELOPMENT AGENCY**
HOUSING CHOICE VOUCHER PROGRAM
**Lease Supplemental Agreement**

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions

1. PARTIES TO THE AGREEMENT DEFINED:

As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

a. Tenant    SONDRA MADDEN
b. Owner    LEATHA HENDERSON

Tenant #    t0016876
Vendor #    v0003132

2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:

SONDRA MADDEN
DALEMARK MADDEN, III
KIANTE MADDEN

DALE MADDEN, JR.
MARCUS SHIOYA BRITTER

3. UNIT ADDRESS: 4620 GALBRATH DR
SACRAMENTO, CA 95842

4. INITIAL LEASE TERM: Begins 6/25/2007 and ends 5/31/2008

5. INITIAL CONTRACT RENT: $1,330.00    INITIAL TENANT RENT: $499.00

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by "Owner". The tenant shall provide or pay for the utilities or appliances indicated below by "Tenant". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
|------|---------|
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Refrigerator | Tenant |
| Water Heat - Natural Gas | Tenant |
| Range/Microwave | Owner |
| Sewer | Owner |
| Trash Collection | Owner |
| Water | Owner |

_Sondra Madden_
SONDRA MADDEN

_Leatha B. Henderson_
Owner / Agent

916 - 339 - 2894
Telephone Number

650-878-9776
Telephone Number

7-10-07
Date

7-10-07
Date

**Tenancy Addendum**
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program
(To be attached to Tenant Lease)

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 07/31/2007)

1. **Section 8 Voucher Program**

   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**

   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**

   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

   d. The tenant may not sublease or let the unit.

   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**

   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

      (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

      (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**

   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**

   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**

   a. Maintenance
      (1) The owner must maintain the unit and premises in accordance with the HQS.
      (2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

   b. Utilities and appliances
      (1) The owner must provide all utilities needed to comply with the HQS.
      (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
         (a) Pay for any utilities that are to be paid by the tenant.
         (b) Provide and maintain any appliances that are to be provided by the tenant.

   c. Family damage. The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

   d. Housing services. The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**

   a. Requirements. The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

   b. Grounds. During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
      (4) Other good cause (as provided in paragraph d).

   c. Criminal activity or alcohol abuse.
      (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
         (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including

property management staff residing on the premises);
         (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
         (c) Any violent criminal activity on or near the premises; or
         (d) Any drug-related criminal activity on or near the premises.
      (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
         (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees or that, in the case of the State of New Jersey, is a high misdemeanor; or
         (b) Violating a condition of probation or parole under Federal or State law.
      (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
      (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

   d. Other good cause for termination of tenancy
      (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
      (2) During the initial lease term or during any extension term, other good cause includes:
         (a) Disturbance of neighbors,
         (b) Destruction of property, or
         (c) Living or housekeeping habits that cause damage to the unit or premises.
      (3) After the initial lease term, such good cause includes:
         (a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

e. **Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and

local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. Eviction by court action. The owner may only evict the tenant by a court action.

g. Owner notice of grounds
  (1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.
  (2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.
  (3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9.   Lease: Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

10.   PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11.   Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

12.   Security Deposit
  a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)
  b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.
  c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.
  d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

13.   Prohibition of Discrimination
In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

14.   Conflict with Other Provisions of Lease
  a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.
  b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

15.   Changes in Lease or Rent
  a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.
  b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:
    (1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;
    (2) If there are any changes in lease provisions governing the term of the lease;
    (3) If the family moves to a new unit, even if the unit is in the same building or complex.
  c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.
  d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

16.   Notices
Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

17.   Definitions
Contract unit. The housing unit rented by the tenant with assistance under the program.
Family. The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

United States, et al., v. Henderson, et al.
First Amended Complaint for Damages, Jury Trial Demanded; Case No: 2:15-cv-00195-KJM CKD

-14-



## National Association of Independent Landlords

## Residential Lease

**1. PARTIES:** This Lease Agreement is made effective as of _____, by and between _LEATHA HENDERSON_ ("Landlord"), and _DALE + SANDRA MADDEN_ ("Tenant"). The parties agree as follows:

**2. PREMISES:** Landlord, in consideration of the lease payments provided in this Lease, leases to Tenant _DALE + SANDRA MADDEN_ "Premises") located at _4620 GALBRATH DR SACRAMENTO CA 95842_

**3. LEGAL DESCRIPTION:** The legal description for the Premises is Lot _165_, Block _____, Unit _2_, Section _____ Addition in the City of _Sacramento_ of _Sacramento_ (County or Parish).

**4. STORAGE:** Tenant shall be entitled to store items of personal property in _N/A_ during the term of Lease. Landlord shall not be liable for loss of, or damage to, such stored items.

**5. PARKING:** Tenant shall be entitled to use _N/A_ parking spaces for the parking of the Tenant's customers'/ guests' motor vehicles. vehicles shall be parked in the yard.

**6. OCCUPANTS:** The Premises may not be occupied by more than _5_ person(s), consisting of _2_ adult(s) and _3_ child(ren) under the age of _21_ years, unless the prior written consent of the Landlord is obtained. The only occupants permitted on this property are: _Dale, Sandra, Dale III, Marcus, Kianna_

**7. GUESTS:** Tenant shall not permit any guest to occupy the premises longer than fourteen (14) days without prior written consent from the landlord.

**8. TERM:** The lease term will begin on the _25_ day of _JUNE_, _2007_ and will terminate on the day of _25 JUNE_, 20_08_.

**9. TERMINATION NOTICE:** Lease will automatically renew on a month to month basis if Tenant fails to provide Landlord written notice Tenant's intent to vacate and terminate this Lease at least ___ days prior to the termination date or the end of any renewal period of this Lease. notices must be in writing. *Verbal notices will not be permitted under any circumstance.* If the lease is automatically renewed on a month-to-month basis and either party intends to terminate the Lease written notice must be given to the other party stating the renewal of this Lease shall terminate on the date designated in the notice which is at least thirty ___ days after the notice is given.

**10. LEASE PAYMENTS:** Tenant shall pay to Landlord a lease payment of $_1450.00_ per month on the _1st_ day of each month, payable in advance and without demand. The first full month's rent is due and payable no later than _6th_. Thereafter, Tenant will pay the monthly rent on or before the first day of each month during this Lease. Weekends and holidays do not delay or excuse Tenant's obligation to timely pay rent. Lease payments shall be made to the Landlord at _Washington Mutual Bank (checking acct)_ _Antelope CA_, as may be changed from time to time by Landlord. If the Lease is renewed automatically on a month to month basis, Landlord may increase rent payments by providing the term of this lease. If the Lease is renewed automatically on a month to month basis, Landlord may increase rent payments by providing the written notice to the Tenant thirty (30) days prior to the increase. All payments received by the Landlord from the Tenant must first be applied to non-rent responsibilities of Tenant including repairs, returned check charges, late payments, periodic utilities, if any, then to rent regardless of notations on a check.

**11. LATE PAYMENTS:** If Tenant fails to timely pay any month's rent, Tenant will pay Landlord an initial late charge of $_35.00_ pl___ additional daily late charges of $_1.00_ per day thereafter until rent is paid in full. However, if Landlord receives the monthly rent by t___ ___ day of each month, Landlord will waive the late charges for that month. Any waiver of late charges under this paragraph will not affect diminish any other right or remedy Landlord may exercise for Tenant's failure to timely pay rent (including reporting late payment to the nation___ credit bureaus).

Tenant's initials: _SM_, _DM_, _____,     Landlord's initials _LH_, _____

1

12. NON-SUFFICIENT FUNDS:  Tenant shall be charged 35___ for each check that is returned to Landlord for lack of sufficient funds.

13. SECURITY DEPOSIT:  At the time of the signing of this Lease, Tenant shall pay to the Landlord, in trust, a security deposit of $1000 ___ to be held and disbursed for Tenant damages to the Premises (if any) as provided by law.  The Deposit is not rent and shall not be applied to last month's rent.  Landlord shall refund the deposit or any balance of the deposit upon termination of the Lease. Tenant must give Landlord at least thirty days written notice of surrender before Landlord is obligated to refund or account for the security deposit.  Landlord shall deduct reasonable charges from the Deposit for the following:  unpaid rent, late payment charges, non-sufficient fund charges, unpaid utilities, damages or repairs, trips to unlock premises when Tenant does not have keys, unreturned keys, cost of replacing locks and key duplicates, unapproved holes, stains, cleaning, pest control, removal of trash, government fees or fines against tenant, insufficient light bulbs, damage to floors, draperies or any permanent fixture on premises, attorney fees incurred in any court proceeding against Tenant and other items provided for in Lease.

14. POSSESSION:  Tenant shall be entitled to possession on the first day of the term of this Lease, and shall yield possession to Landlord on the last day of the term of this Lease, unless otherwise agreed by both parties in writing.  If the Tenant is unable to occupy the premises by the third day after the commencement date of this Lease due to prior tenant's holding over of lease or construction on premises, Tenant may terminate this Lease by giving written notice to Landlord before the premises becomes available to be occupied by Tenant and Landlord shall refund the deposit, and any rent paid, to the tenant.

15. USE OF PREMISES/ABSENCES:  Tenant shall occupy and use the Premises only as a private dwelling unit.  Tenant shall notify Landlord of any anticipated extended absence from the Premises not later than the first day of the extended absence.  Tenant shall not permit the property to be used for any type of business.  Tenant shall not conduct any activity which is in violation of any applicable deed, subdivision restriction or homeowner association.  Tenant shall not use the premises for any illegal activity or any activity which is offensive, noisy, or dangerous.

16. KEYS:  If all keys are not returned to the Landlord at the end of the lease, the Tenant shall be charged $300 .  Tenant shall not change or re-key locks without written permission from Landlord.  Landlord shall re-key the exterior door locks and security systems since the previous tenant vacated the premises.  If any door lock or security system is damaged or is not working properly Landlord shall repair or replace them.  Landlord shall be notified in writing of any defects to door locks or security systems.  Any expenses due to damage to door locks or security systems by Tenant, Tenant's family or guests shall be the responsibility of the Tenant.  If Tenant requests, Landlord shall install the following at Tenant's expense: a keyless bolting device on an exterior door, a door viewer on an exterior door, a keyed dead bolt on an exterior door, and a sliding door pin lock or sliding door security bar on a sliding door.  All requests for re-keying, installing, replacing or repairing locks or security systems by tenant must be in writing.  All items installed by Tenant not allowed in this Lease will become the property of the Landlord.

17. LOCKOUT:  If the Tenant becomes locked out of the Premises, the Tenant will be charged 300 to gain re-entry.

18. REMODELING OR STRUCTURAL IMPROVEMENTS:  Tenant shall not, without written permission from Landlord do any of the following:  remove any portion of the property or Landlord's personal property for any purpose, make holes in walls, floors, or woodwork except for the purpose of hanging pictures on walls, install alarm systems, electrical outlets or telephone cables, replace carpet, paint, remove or replace wallpaper, remove or install any permanent fixture, or permit any water beds or other water furniture in the property.  Tenant shall not allow any lien to be filed by anyone against the Property.

19. MAINTENANCE:  Tenant shall be responsible for the following:

    \*damages to windows, doors, screens, walls, floors, or any permanent fixture not caused by Landlord's negligence
    \*replacement of yard or shrubbery due to Tenant's negligence
    \*taking appropriate measures to protect water pipes from damage due to freezing
    \*damages resulting from Tenant's failure to notify Landlord of necessary repairs
    \*damages caused by Tenant or Lawful occupant, family member, or guest of Tenant
    \*Tenant will supply all air conditioning and heating filters at monthly intervals and will supply light bulbs and smoke detector batteries
    \*Tenant shall keep entire premises clean and sanitary, dispose of garbage in the appropriate receptacles
    \*promptly eliminate dangerous conditions on the Property caused by Tenant or Tenant's guest
    \*replace any lost or misplaced keys
    \*pay any periodic, preventive, or additional extermination costs desired by Tenant
    \*Notify Landlord immediately of all needed repairs

Tenant's initials ___, ___, ___ Landlord's initials ___, ___.

2

Yard maintenance will be the responsibility of the _TENANT_.
Pool maintenance will be the responsibility of the _N/A_.

## 20.  REPAIRS:

(a) Tenant will pay Landlord, or any repairman Landlord directs Tenant to pay the cost to repair any :

* repair caused by Tenant, a member of Tenant's family, a guest of Tenant, or a lawful occupant
* damage from wastewater stoppages caused by foreign objects in the lines that exclusively service the Property
* damage to doors
* damage to windows
* damage to screens
* damage due to window being left open

(b)  Landlord will pay for repair conditions that adversely affect the health or safety of an ordinary tenant, except for the repairs listed in 20 (a).

(c)  Tenant will pay Landlord, or any repairman Landlord directs Tenant to pay, the first _$75_ of the repair cost and Landlord shall pay the remainder.

## 21. SMOKE DETECTORS: The Property to be equipped with smoke detectors in certain locations and will govern the rights and obligations of the parties regarding smoke detectors. Requests for additional installation, inspection, or repair of smoke detectors must be in writing. Disconnecting or intentionally damaging a smoke detector or removing a battery without immediately replacing it with a working battery may subject Tenant to civil penalties and liability for damages and attorney fees.

## 22. SECURITY DEVICES AND EXTERIOR DOOR LOCKS: The Property to be equipped with certain types of locks and security devices and will govern the rights and obligations of the parties regarding security devices. All notices or requests by Tenant for rekeying, changing, installing, repairing, or replacing security devices must be in writing. Installation of additional security devices or additional rekeying or replacement of security devices desired by Tenant will be paid by Tenant in advance and may only be installed by Landlord or Landlord's contractors after receiving a written request from Tenant.

## 23. ACCESS BY LANDLORD TO PREMISES: Subject to Tenant's consent (which shall not be unreasonably withheld), Landlord shall have the right to enter the Premises to make inspections, provide necessary services, or show the unit to prospective buyers, mortgagees, tenants or workers, to exercise a contractual or statutory lien, leave written notices, or seize nonexempt property after event of default. As provided by law, in the case of an emergency, Landlord or anyone authorized by Landlord, may enter the Premises without Tenant's consent.

## 24. MOVE-IN CONDITION: Tenant has inspected and accepts the Property AS-IS except for conditions materially affecting the safety or health of ordinary persons or unless expressly noted otherwise in this Lease. Landlord has made no express or implied warranties as to the condition of the Property and no agreements have been made regarding future repairs unless specified in this Lease. Tenant will complete an Inventory and Condition Form, noting any defects or damages to the Property, and deliver it to Landlord within 48 hours after the Commencement Date. Tenant's failure to timely deliver the Inventory and Condition Form will be deemed as Tenant's acceptance of the Property in a clean and good condition. The Inventory and Condition Form is not a request for maintenance or repairs. Tenant must direct all request for repairs in compliance with paragraph .

Tenant's initials _JM DM_ , _____ , _____.   Landlord's initials _RH_ , _____.

3

25. **MOVE-OUT CONDITION AND FORFEITURE OF TENANT'S PERSONAL PROPERTY:** Tenant will surrender the Property in the same condition as when received, normal wear and tear accepted. "Normal wear and tear" means deterioration that occurs without negligence, carelessness, accident, or abuse. Tenant will leave the Property in a clean condition free of all trash, debris, and any personal property or belongings. If Tenant leaves any personal property or belongings in the Property after Tenant surrenders possession of the Property, all such personal property or belongings shall be forfeited to and become the property of Landlord. "Surrender" means vacating the Property and returning all keys and access devices to Landlord.

26. **UTILITIES AND SERVICES:** Tenant shall be responsible for all utilities including gas, electricity, water, cable, wastewater, and garbage removal unless otherwise agreed upon in Lease.

27. **PROPERTY INSURANCE:** Landlord and Tenant shall each be responsible to maintain appropriate insurance for their respective interests in the Premises and property located on the Premises.

28. **DANGEROUS MATERIALS:** Tenant shall not keep or have or dispose of on the Premises any article or thing of a dangerous, inflammable, or explosive character that might substantially increase the danger of fire on the Premises, or that might be considered hazardous by a responsible insurance company, unless the prior written consent of Landlord is obtained and proof of adequate insurance protection is provided by Tenant to Landlord.

29. **TAXES:** Taxes attributable to the Premises or the use of the Premises shall be allocated as follows:

      Real Estate Taxes – Landlord shall pay all real estate taxes and assessments for the Premises.
      Personal Taxes – Landlord shall pay all personal taxes and any other charges which may be levied against the Premises and which are attributable to Tenant's use of the Premises.

30. **DESTRUCTION OR CONDEMNATION OF PREMISES:** If the Premises are partially destroyed in a manner that prevents the conducting of Tenant's use of the Premises in a normal manner, and if the damage is reasonably repairable within sixty days after the occurrence of the destruction, and if the cost of repair is less than $_100_, Landlord shall repair the Premises and these lease payments shall abate during the period of the repair. However, if the damage is not repairable within sixty days, or if the cost of repair is $_100_ or more, or if the Landlord is prevented from repairing the damage by forces beyond Landlord's control, or if the property is condemned, this Lease shall terminate upon twenty days written notice of such event or condition by either party.

31. **DEFAULTS:** Tenant shall be in default of this Lease, if Tenant fails to fulfill any lease obligation or term by which Tenant is bound. Subject to any governing provisions of law to the contrary, if Tenant fails to cure any financial obligation within _30_ day(s) (or any other obligation within _30_ day(s)) after written notice of such default is provided by Landlord to Tenant, Landlord may take possession of the Premises without further notice, and without prejudicing Landlord's rights to damages. In the alternative, Landlord may elect to cure any default and the cost of such action shall be added to Tenant's financial obligations under this Lease. Tenant shall pay all costs, damages, and expenses suffered by Landlord by reason of Tenant's defaults. Tenant shall also be liable to Landlord for a reletting charge of $_1450.°°_ (not to exceed one month's rent) if Tenant fails to give thirty (30) days written notice, moves out at Landlord's request due to Tenant's default, moves out without written approval, moves out without paying rent in full for the entire term of this Lease contract or renewal period, or is evicted.

32. **HOLDOVER:** If Tenant maintains possession of the Premises for any period after the termination of this Lease ("Holdover Period"), Tenant shall pay to Landlord a lease payment for the Holdover Period based on the terms of the previous Lease Payments paragraph. Such holdover shall constitute a month to month extension of this Lease. $_48.°°_ per day shall be charged.

33. **CONTRACTUAL LIEN:** <u>All property in the premises is subject to a contractual Landlord's lien to secure payment of delinquent rent and all delinquent amounts due under this Lease. Landlord shall do the following in order to exercise Landlord's contractual lien: Landlord shall leave written notice afterwards at the premises in a conspicuous place. This notice must include amount of delinquent rent and other delinquent charges, name, address and phone number of person to contact about the amount owed and notice must state that all of Tenant's property will be returned promptly when delinquent rent is payed. Tenant is responsible for all costs incurred by Landlord in packing, removing and storing Tenant's personal property.</u>

Tenant's initials _____, _____ _____, _____ Landlord's initials _____ _____

4

If Tenant surrenders or vacates the premises or is evicted Landlord or officers of the Law may peacefully enter, remove and store all of Tenant's personal property (including vehicles). Landlord may sell Tenant's personal property removed from a surrendered or vacated property. Sale may be public or private, subject to any lien claims or third-party ownership. Proceeds of the sale may be applied to delinquent rents, packing , moving, storage and sale costs. Proceeds of the sale in excess of amounts owed to Landlord must be mailed to Tenant at Tenant's last known address within thirty (30) days of the sale. Landlord must provide written notice thirty (30) days prior to the sale by first class mail and certified mail, return receipt requested. Notice must state the amount owed by Tenant, name, address and telephone number of the person to contact about the sale, and the date, time and place of the sale. The sale of the property must be to the highest cash bidder. Court hearings prior to the proceedings set forth in this paragraph are not required.

34. HABITABILITY: Tenant has inspected the Premises and fixtures (or has had the Premises inspected on behalf of Tenant), and acknowledges that the Premises are in a reasonable and acceptable condition of habitability for their intended use, and the agreed lease payments are fair and reasonable. If the condition changes so that, in Tenant's opinion, the habitability and rental value of the Premises are adversely affected, Tenant shall promptly provide reasonable notice to Landlord. Landlord has made no express or implied warranties as to the condition of the Premises and no agreements have been made for future repairs unless specified in this Lease.

35. PETS: *No Pets* Pets, including mammals, reptiles, birds, fish, rodents or insects, shall not be allowed without prior written consent of the Landlord. If the Tenant is in violation of the pet restriction Tenant violates the pet restriction Landlord may collect a fee of $ *N/A* for each day the Tenant violates the pet restriction. If Tenant violates the pet restriction Tenant will be subject to charges for damages and eviction. Landlord may remove any unauthorized pets by providing 24 hour prior written notice of intent to remove pet. Unauthorized pets must be delivered to appropriate local authorities or local authorities may be asked to remove unauthorized pets. The Landlord will not be liable for any sickness, injury or death to any unauthorized pet due to Landlord's negligence. Tenant shall be responsible for all costs incurred by the Landlord in the removal of the unauthorized pet and for any damages to the property.

36. ASSIGNABILITY/SUBLETTING: Tenant may not assign or sublease any interest in the Premises without the prior written consent of Landlord, which shall not be unreasonably withheld.

37. TERMINATION UPON SALE OF PREMISES: Landlord may clearly display a "For Sale" or "For Lease" or similarly worded sign on the Premises during the term of Lease or renewal period. Notwithstanding any other provision of this Lease, Landlord may terminate this lease upon ____ day(s) written notice to Tenant that the Premises have been sold.

38. NOTICE: Notices under this Lease shall not be deemed valid unless given or served in writing and forwarded by mail, postage prepaid, addressed as follows:

Landlord:

*LEATHA HENDERSON*
*2264 MENALTO AVE*
*E. PALO ALTO CA 94303*

Tenant:

*Dale & Sonda MADDEN*
*4620 Galbraith DR*
*SACRAMENTO, CA 95842*

Such addresses may be changed from time to time by either party by providing notice as set forth above.

39. LIABILITY: Landlord shall not be responsible to Tenant, Tenant's family members, Tenant's guest or other occupants for any injuries, damages, or losses to person or property caused by flood, fire, smoke, explosion, hail, ice, water leakage, burglary, theft, assault, vandalism or other occurrences or casualty losses.

40. LEAD-BASED PAINT NOTICE: If the Property was built before 1978, federal law requires the Landlord to provide a federally approved pamphlet on lead poisoning prevention to Tenant and to disclose Landlord's knowledge of any lead-based paint or hazard in the Property. If the Property was built before 1978, an Addendum Regarding Lead-Based paint should be attached to Lease.

Tenant's initials *Sm* , *SM* , ____ , ____ . Landlord's initials *LH* .

5

41. ENTIRE AGREEMENT/AMENDMENT: This Lease Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Lease may be modified or amended in writing, if the writing is signed by the party obligated under the amendment.

42. SEVERABILITY: If any portion of this Lease shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Lease is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

43. CUMULATIVE RIGHTS: The rights of the parties under this Lease are cumulative, and shall be construed as exclusive unless otherwise required by law.

44. GOVERNING LAW: This Lease shall be construed in accordance with the laws of the state of _California_

45. SUBORDINATION OF LEASE: This Lease is subordinate to any mortgage that now exists, or may be given later by Landlord, with respect to the Premises.

46. ADDITIONAL PROVISIONS: _Tenant Approved Section 8 - Voucher_
_$1330.00   Tenant Agrees to pay the difference $120.00_
_Total $1450.00_

Executed on this _25_ day of _June_, 200_7_

LANDLORD: _____        TENANT: _Sondra Madden_

LANDLORD: _____        TENANT: _Dale Madden_

6

This Change is
Only if Keys are Lost
And a Lock Smith
has to be Called
to Change the locks

Page 2

$300 °° (Estimated)
Cost.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

Sacramento
Housing &
Redevelopment
Agency

701 – 12th Street
Sacramento, CA 95814
(916) 440-1390
TTY (916) 277-1309
www.shra.org

April 17, 2009

LEATHA HENDERSON
2264 MENALTO AVE
E PALO ALTO, CA 94303

Tenant Number:   t0016876
Vendor Number:   v0003132
Unit Number:     00476330

## SUBSIDY ADJUSTMENT NOTICE

The housing assistance subsidy currently paid to the owner as rent for the tenant family's address, shown below, shall be adjusted as follows, effective June 01, 2009

| CURRENT HOUSING ASSISTANCE PAYMENT: | $825.00 |
| TENANT RENT: | $505.00 |
| CONTRACT RENT: | $1,330.00 |

| NEW HOUSING ASSISTANCE PAYMENT: | $834.00 |
| TENANT RENT: | $496.00 |
| CONTRACT RENT: | $1,330.00 |

The reason for this adjustment is:
☑ Family income changed
☐ Family composition changed
☑ Annual recertification
☐ Other:

If the family has Zero Housing Assistance Payment, they will remain active in the Housing Choice Voucher program for 180 days from the above adjustment date provided they do not move from the contract unit and there are no changes in the family composition or income.

Helen Taylor
(916) 440-1390

......................................................................................................

## FOR THE TENANT FAMILY

You have the right to request an informal hearing of the agency's determination provided you submit a written request within fifteen (15) days from the date of this notice.

Cc:   SONDRA MADDEN
      4620 GALBRATH DR
      SACRAMENTO, CA 95842

SHRA_SubsidyAdjustment.doc

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

26

27

28



**Sacramento
Housing &
Redevelopment
Agency**

701 ~ 12ᵗʰ Street
Sacramento, CA 95814
(916) 440-1390
TTY (916) 277-1309
www.shra.org

March 09, 2010

SONDRA MADDEN
4620 GALBRATH DR
SACRAMENTO, CA 95842

Tenant Number:   t0016876
Vendor Number:   v0003132
Unit Number:     00476330

# SUBSIDY ADJUSTMENT NOTICE

The housing assistance subsidy currently paid to the owner as rent for the tenant family's address, shown below, shall be adjusted as follows, effective June 01, 2010

CURRENT HOUSING ASSISTANCE PAYMENT :       $834.00
TENANT RENT:       $496.00
CONTRACT RENT:       $1,330.00

NEW  HOUSING ASSISTANCE PAYMENT:       $874.00
TENANT RENT:       $456.00
CONTRACT RENT:       $1,330.00

The reason for this adjustment is:
☐ Family income changed
☐ Family composition changed
☒ Annual recertification
☐ Other

If the family has Zero Housing Assistance Payment, they will remain active in the Housing Choice Voucher program for 180 days from the above adjustment date provided they do not move from the contract unit and there are no changes in the family composition or income.

Keri Valdez
(916) 440-1390

## FOR THE TENANT FAMILY

You have the right to request an informal hearing of the agency's determination provided you submit a written request within fifteen (15) days from the date of this notice.

Cc:   LEATHA HENDERSON
2264 MENALTO AVE
E PALO ALTO, CA 94303

SHRA_SubsidyAdjustment.doc

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT E



**Sacramento Housing & Redevelopment Agency**

701 – 12ᵗʰ Street
Sacramento, CA 95814
(916) 440-1390
TTY (916) 277-1309
www.shra.org

April 04, 2012

LEATHA HENDERSON
2264 MENALTO AVE
E PALO ALTO, CA 94303

Tenant Number:   t0016876
Vendor Number:   v0003132
Unit Number:     00476330

## SUBSIDY ADJUSTMENT NOTICE

The housing assistance subsidy currently paid to the owner as rent for the tenant family's address, shown below, shall be adjusted as follows, effective June 01, 2012

CURRENT HOUSING ASSISTANCE PAYMENT:     $891.00
TENANT RENT:     $439.00
CONTRACT RENT:     $1,330.00

NEW  HOUSING ASSISTANCE PAYMENT:     $869.00
TENANT RENT:     $461.00
CONTRACT RENT:     $1,330.00

The reason for this adjustment is:
☐ Family income changed
☐ Family composition changed
☑ Annual recertification
☐ Other:


If the family has Zero Housing Assistance Payment, they will remain active in the Housing Choice Voucher program for 180 days from the above adjustment date provided they do not move from the contract unit and there are no changes in the family composition or income.

Mylinh Tran
(916) 440-1390

---

### FOR THE TENANT FAMILY

You have the right to request an informal hearing of the agency's determination provided you submit a written request within fifteen (15) days from the date of this notice.

Cc:    SONDRA MADDEN
       4620 GALBRATH DR
       SACRAMENTO, CA 95842

SHRA_SubsidyAdjustment.doc

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT F



## Rental Payment Adjustment

To Dale and Sondra Madden,

Effective June 1, 2009 your rental payment will be adjusted to the following:

Current:

Rental Payment: 1500.00

Housing:        825.00

Tentant:        675.00


New rental payment:     1500.00

Housing:                834.00

Tentant:                666.00


A new rental agreement will be mail to you soon.

Regards

Leatha Henderson     Date: April 29,2009

Page 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT G

Rent Payment Change

To Dale and Sondra Madden:

Effective June 1,2010 the rent owed will be as follow:

Current
Housing
                                    834.00
Tenant rent
                                    666.00
                                   ‾‾‾‾‾‾‾
                                   1500.00

New rent payment
Housing
                                    874.00
Tenant rent
                                    626.00
                                   ‾‾‾‾‾‾‾
                                   1500.00

Thanks

Leatha Henderson

Page 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT H

United States, et al., v. Henderson, et al.
First Amended Complaint for Damages, Jury Trial Demanded; Case No: 2:15-cv-00195-KJM CKD

-20-

Leatha Henderson
2264 Menalto Ave
E. Palo Alto. Ca 94303
Phone 650-838-9776

May 22, 2012

To: Dale and Sondra Madden:

Effective June 1, 2012 your rent will be adjusted as follows:

Current Housing Assistance Payment:          $891.00

                              Tenant Rent:    $609.00

                            Contract Rent:    $1500.00

New Housing Assistance Payment:              $869.00

                              Tenant Rent:    $631.00

                            Contract Rent:    $1500.00

Signature

X *Leatha Henderson*
5/23/2012

X *Sondra Madden* 5-23-12
X *Dale Madden* 5-23-12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

# LEASE AGREEMENT

1. **PARTIES:** The parties to this agreement are _Leatha Henderson_ hereinafter referred to as "Landlord, and _Dale and Sandra madden_, hereinafter referred to as "Tenant(s).

2. **PROPERTY:** Landlord hereby lets the following property to Tenant for the term of this agreement known as: _4620 Galbraith Dr Sacramento CA 95842._

3. **TERM:** The term of the Agreement shall be from _June 1, 2012_ and ending on _June 1, 2013_

4. **RENT:** The monthly rental for said property shall be $ _1500.00_.

5. **LATE CHARGES:** Any rent installment that is paid more than five (5) days after its due date shall include a late charge of $ _40.00_. Said late charges shall become a separate portion of rent due under the Terms and Conditions of this Lease.

6. **RETURN CHECK CHARGES:** A charge of $ _25.00_ shall be paid by Tenant for any check that is returned unpaid. Upon return or dishonor of any check tendered as payment of rent, late charges will be assessed as if no rental payment was attempted.

7. **UTILITIES, APPLIANCES & OTHER ITEMS FURNISHED BY LANDLORD:**

   Utilities shall be paid by the party indicated on the following chart-,

|  | LANDLORD | TENANT |
|---|---|---|
| Electricity |  | X |
| Gas |  | X |
| Water | X |  |
| Garbage | X |  |

8. **USE OF PROPERTY, OCCUPANTS, AND GUESTS:** Tenant shall use the subject property for residential purposes only. The property shall be occupied only by those Tenants listed in item one (1), PARTIES, of this Lease.

9. **TENANT'S DUTY TO MAINTAIN PREMISES:** Tenant shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring tenants to maintain rented premises. If damage to the dwelling unit other dm normal wear and tear is caused by acts or negligence of Tenant or others occupying the premises under his/her control, Landlord may cause such repairs to be made, and Tenant shall be liable to Landlord for any reasonable expense thereby incurred by Landlord.

10. **ALTERATIONS:** No alteration, addition, or improvements shall be made by Tenant in or to the dwelling unit without the prior written consent of Landlord. Such consent shall be totally at Landlord's option.

11. **NOISE:** Tenant agrees not to allow on the premises any excessive noise or other activity, which disturbs the peace and quiet of others.

12. **INSPECTION BY LANDLORD:** The Tenant agrees to allow Landlord to enter the subject premises in order to inspect the premises, make necessary or agreed repairs, decorations, alterations, or improvements, supply necessary or agreed services, or exhibit the dwelling unit to prospective or actual-purchasers, mortgagees, tenants, workmen, or contractors. The Landlord may enter the dwelling unit without consent to Tenant in case of emergency.

13. **SECURITY DEPOSIT:** Tenant agrees to deposit with Landlord upon execution of the Lease contract, receipt of which is hereby acknowledged, the sum of $1000.00 . This deposit is held as security against any damage to the entire property, including but not limited to furniture, appliances, fixtures, and carpet; and Tenant vacating the entire premises prior to the termination date of this Lease, or failing to perform any and all the covenants herein. Said deposit is neither an advance rental payment nor a bonus to the Landlord, and Landlord agrees that if all the covenants imposed upon Tenant have been fulfilled, Landlord shall refund said deposit by mail to the address furnished by the Tenant, after the premises have been vacated by Tenant and inspected by Landlord as provided by statute. .

14. **SUBLEASING:** Tenant shall not assign this Agreement or sublet the dwelling unit without prior written consent of Landlord. Such consent shall be totally at Landlord's option.

15. **PERSONAL INJURY AND PROPERTY DAMAGE:** Subject to standards required by law, neither Landlord nor its principal shall be liable to Tenant, his family, employees, or guests, for any damage to person or property caused by the acts or omissions of other Tenants or other persons, whether such persons be off the property of Landlord or on the property with or without permission of Landlord; nor shall Landlord be liable for losses or damages from theft, fire, water, rain, storm, explosion, sonic boom, or other causes whatsoever, nor shall Landlord be liable for loss or damages resulting from failure, interruption, or malfunctions in the utilities provided to Tenant under this Lease Agreement; nor shall Landlord be liable for injuries elsewhere on the premises.

LANDLORD IS NOT RESPONSIBLE FOR, AND WILL NOT PROVIDE, FIRE OR CASUALTY INSURANCE FOR THE TENANT'S PERSONAL PROPERTY.

16. **IN CASE OF MALFUNTION OF EQUIPMENT, DAMAGE BY FIRE, WATER OR ACT OF GOD:** Tenant shall notify Landlord immediately of malfunction of equipment, damage by fire, water or act of God and Landlord shall repair the damage with reasonable promptness, or if the premises are deemed by the Landlord to be damaged so much as to be unfit for occupancy, or if the Landlord decides not to repair or restore the building, this Lease shall terminate. If the Lease is so terminated, rent will be prorated on a daily basis so that Tenant will pay only to the date of the damage, and the remainder of the month will be refunded.

17. **PETS:** Tenant shall not permit a pet to live on the premises without signing and complying with the provisions of a separately negotiated Pet Agreement. All pets are subject to visual inspection and approval to Landlord at such times as Landlord may direct during normal working hours.

18. **TERMINATION - ALL TENANTS PLEASE TAKE NOTICE!** At least thirty (30) days prior to the termination date of this Lease Agreement, Tenant must give Landlord written notice of his intent to vacate the subject premises.

19. **ATTORNEY'S FEES:** Violation of any of the conditions of this Agreement shall be sufficient cause for eviction from said premises. Tenants agree to pay all costs of such action or cost of collection of damages as a result of Tenant's breach of this Agreement, including reasonable attorney's fees.

20. **NOTICES:** All notices provided for by this Agreement shall be in writing and shall be given to the party as follows: To Tenant, at the premises: to Landlord 2264 Menalto Ave E Palo Alto CA 94303

21. **ABSENCE OR ABANDONMENT:** The Tenant must notify the Landlord of any extended absence from the premises in excess of seven (7) days. Notice shall be given on or before the first day of any extended absence. The Tenant's unexplained and/or extended absence from the premises for (30) days or more without payment of rent as due shall be prima facie evidence of abandonment. The Landlord is then expressly authorized to enter, remove, and store all personal items belonging to the Tenant. If Tenant does not claim said personal property within an additional thirty (30) days, Landlord may sell or dispose of said personal property and apply the proceeds of said sale to the unpaid rents, damages, storage fees, sale costs, and attorney's fees. Any unclaimed balance held by the Landlord for a period of six (6) months shall be forfeited to the Landlord.

22. **TERMINATION FOR VIOLENT OR DANGEROUS BEHAVIOR:** Landlord shall terminate this Lease Agreement within three (3) days from the date written notice is delivered to the Tenant if the Tenant or any other persons on the premises with the Tenant's consent willfully or intentionally commits a violent act or behaves in a manner which constitutes or threatens to be a real and present danger to the health, safety, or welfare of the life or property of others.

23. **RULES AND REGULATIONS:** Tenant has read and agrees to abide by all Rules and Regulations of the Landlord as they presently exist or as they may be amended at Landlord's sole discretion.

24. We the undersigned do hereby execute and agree to this Lease Agreement, this 23rd day of May 2012.

Seartha B. Henderson
LANDLORD

X 5/23/2012
DATE

Sasha Madd
TENANT
Dale Madder

X 5-23-12
DATE

# RULES AND REGULATIONS
## *(Referred to in and made a part of the Parties' Lease Agreement)*

1. No signs, notices, or advertisements shall be attached to or displayed by Tenant on or about said premises. Additionally, no antenna or satellite dish shall be attached to or displayed on or about the premises.

2. Profane, obscene, loud, or boisterous language, or unseemly behavior and conduct is absolutely prohibited, and Tenant obligates himself and those under him not to do or permit to be done anything that will annoy, harass, embarrass, or inconvenience any of the other tenants or occupants in the subject or adjoining premises.

3. No motor vehicle shall be kept upon the property that is unlicensed, inoperable, or in damaged condition. Damaged condition includes but is not limited to flat tires. Any such vehicle that remains on the property for more than ten (10) days after notice to remove same has been placed on subject vehicle shall be towed by wrecker and stored with a wrecker service at the tenant's and/or the vehicle owner's expense.

4. In keeping with Fire Safety Standards, all motorized vehicles including motorcycles must be parked outside. No motorized vehicles shall be parked in any building structure on the property except authorized garage spaces.

5. In accordance with Fire Safety Standards and other safety regulations, no Tenant shall maintain or allow to be maintained, any auxiliary heating unit, air conditioning units, or air filtering units without prior inspection and written approval of Landlord.

6. The sound of musical instruments, radios, televisions, phonographs, and singing shall at all times be limited in volume to a point that is not objectionable to other tenants or occupants in the subject or adjoining premises.

7. Only persons employed by Landlord or his agent shall adjust or have anything to do with the heating or air conditioning plants or with the repair or adjustment of any plumbing, stove, refrigerator, dishwasher, or any other equipment that is furnished by Landlord or is part of the subject premises.

8. No awning, venetian blinds, or window guards shall be installed, except where prior approval is given by the Landlord.

9. Tenant shall not alter, replace, or add locks or bolts or install any other attachments, such as doorknockers, upon any door, except where prior approval is given by the Landlord

10. No defacement of the interior or exterior of the buildings or the surrounding grounds will be tolerated

11. If furnished by Landlord, garbage disposal shall only be used in accordance with the disposal victims. All refuse shall be timely removed from the premises and placed outside in receptacles.

12. No spikes, hooks, or nails shall be driven into the walls, ceiling or woodwork of the leased premises without consent of Landlord. No crating of or boxing of furniture or other articles will be allowed within the leased premises.

13. It is specifically understood that Landlord reserves solely to itself the right to alter, amend, modify, and add rules to this Lease.

14. It is understood and agreed that Landlord shall not be responsible for items stored in storage areas.

15. Landlord has the right to immediately remove combustible material from the premises or any storage area.

16. Landlord will furnish one (1) key for each outside door of the premises. All keys must bereturned to Landlord upon termination of the occupancy.

17. Lavatories, sinks, toilets and all water and plumbing apparatus shall be used only for the purpose for which they were constructed.  Sweepings, rubbish, rags, ashes or other foreign substances shall not be thrown therein.  Any damage to such apparatus and the cost of clearing plumbing resulting from misuse shall be the sole responsibility of and win be home by Tenant.

X *Dale Madden*      5-23-12
TENANT                         Date

TENANT                         Date

X *Sandra Madden*   5-23-12
TENANT                         Date

TENANT                         Date

## SECURITY DEPOSIT POLICY

*Refund of the security deposit referred to in the attached Lease Agreement is subject to compliance with all six (6) of the following provisions:*

1. That a <u>full term</u> of the lease has expired and;

2. That thirty (30) day written notice is given, prior to vacating the subject premises at the end of said full term and;

3. That there are no damages to Landlord's property, including but not limited to furniture, appliances, carpet, drapes, blinds, floor coverings and;

4. That the entire apartment, including range, refrigerator, bathrooms, closets and cupboards are clean and;

5. That no late charges, delinquent rents, or fees for the damages remain unpaid and;

6. That all keys, including mailbox keys, are returned to the Landlord.

The following questions and answers are for the purpose of eliminating misunderstandings concerning the security deposit:

1. Question: What charges will be deducted from the deposit if Tenant has failed to comply with all of the above listed six (6) conditions?

Answer:  The cost of all material and labor for cleaning the apartment and making repairs, all delinquent payments and fees, and all rental income lost as a result of Tenant vacating the premises prior to the termination date of his lease, or during any holdover period.

2. Question: What should Tenant be careful to avoid?

Answer: (a) Damage to property, furniture, wars and wall coverings, appliances, carpet, drapes/blinds, and floor coverings.  Departing Tenant will be held responsible for all damages beyond normal wear and tear, (b) Dirty appliances.  Be sure to clean range and refrigerator.

3. Question: How is the Security Deposit returned?

Answer.  If Tenant has complied with all the terms and conditions concerning the Security Deposit, the deposit will be returned by check mailed to a forwarding address furnished to Landlord by Tenant.

NOTE:  The Security Deposit may not be applied to the last monthly rental, or any other rent payment!

| | | | |
|---|---|---|---|
| x _Dale Moulder_  5-23-12 | | | |
| TENANT          Date | | TENANT          Date | |
| _Sasha Makk_  5-23-12 | | | |
| TENANT          Date | | TENANT          Date | |

## PAYMENT POLICY

I, _Dale and Sandra Madden_, understand that all rent is due on the 1st of the month.

- ❖ late on the 6th

- ❖ Eviction begins on the 11th of the month.

- ❖ No exceptions.

I understand and agree that my rent will be paid on time.

X _Dale Madden_
Tenant's Signature

_5-23-12_
Date

X _Sandra Mald_
Tenant's Signature

_5-23-12_
Date

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT J

Print Lease      Save in Word

# Lease Agreement

THIS LEASE (the "Lease") dated *May 1, 2010*

BETWEEN:

Leatha Henderson
Address: 2264 Menalto Ave
E Palo Alto, CA 94303
Telephone: 650 - 838 - 9776
(the "Landlord")

OF THE FIR...
PAI...

- AND -

Sondra Madden
Address: 4620 Galbrath Dr
Sacramento , CA, 95842
Telephone: 916 - 248 - 9692
(collectively and individually the "Tenant")

OF THE SECOND PAF...

- AND -

Dale Madden
Address: 4620 Galbrath Dr
Sacramento, CA 95842
(collectively and individually the "Tenant")

OF THE THIRD PAR...

IN CONSIDERATION OF the Landlord leasing certain premises to the Tenant, the Tenant leasing those premis...
from the Landlord and the mutual benefits and obligations provided in this Lease, the receipt and sufficiency of
which consideration is hereby acknowledged, the parties to this Lease agree as follows:

## Leased Premises

- The Landlord agrees to rent to the Tenant the *House* ~~apartment~~ municipally described as 4620 Galbrath Dr,
  Sacramento, CA 95842, (the 'Premises') for use as residential premises only. The Premises are more
  particularly described as follows: . Neither the Premises nor any part of the Premises will be used at any
  time during the term of this Lease by Tenant for the purpose of carrying on any business, profession, or
  trade of any kind, or for the purpose other than as a private single-family residence.

- Subject to the provisions of this Lease, apart from the Tenant, no other persons will live in the Premises
  without the prior written permission of the Landlord. If LANDLORD, with written consent, allows for
  additional persons to occupy the premises, the rent shall be increased by $100 for each such person. Any
  person staying 14 days cumulative or longer, without the LANDLORD'S written consent, shall be
  considered as occupying the premises in violation of this agreement.

- No guests of the Tenants may occupy the Premises for longer than one week without the prior written
  consent of the Landlord.

- Subject to the provisions of this Lease, the Tenant is entitled to the exclusive use of the following parking
  (the 'Parking') on or about the Premises: . Only properly insured motor vehicles may be parked in the
  Tenant's space.

- The Landlord agrees to supply and the Tenant agrees to use and maintain in reasonable condition, normal
  wear and tear excepted, the following furnishings: .

https://www.rentingauthority.com/lease/leaseagreement.php?id=5148&cid=66175

4/30/200...

- No liquid filled furniture of any kind may be kept on the premises. If the structure was built in 1973 or later TENANT may possess a waterbed if he maintains waterbed insurance valued at $100,000 or more. TENANT must furnish LANDLORD with proof of said insurance. TENANT must use bedding that complies with the load capacity of the manufacturer.

## Terms

- The term of the Lease commences at 12:00 noon on 06/01/2008 and renews monthly until 30 days written notice by the Tenant to the Landlord.

- Should the Tenant remain in possession of the Premises with the consent of the Landlord after the natural expiration of this Lease, a new tenancy from month to month will be created between the Landlord and the Tenant which will be subject to all the terms and conditions of this Lease but will be terminable upon the Landlord giving the Tenant the notice required under the Act.

## Rent

- Subject to the provisions of this Lease, the rent for the Premises is $ per month , which includes any charge for the Parking (collectively the 'Rent').

- The Tenant will pay the Rent on or before the 6th of each and every month of the term of this Lease to the Landlord at payment Washington Mutual, 4117 Elverta, Ca 95843, or at such other place as the Landlord may later designate.

- The Tenant will be charged an additional amount of $ 40 for any late Rent.

## Security Deposit

- On execution of this Lease, the Tenant will pay the Landlord a security deposit of $ (the 'Security Deposit').

- The Landlord will return the Security Deposit at the end of this tenancy, less such deductions as provided in this Lease but no deduction will be made for damage due to reasonable wear and tear nor for any deduction prohibited by the Act.

- During the Term of this Lease or after its termination, the Landlord may charge the Tenant or make deductions from the Security Deposit for any or all of the following:

  - repair of walls due to plugs, large nails or any unreasonable number of holes in the walls including the repainting of such damaged walls;
  - repairing cuts, burns, or water damage to tile, linoleum, rugs, and other areas;
  - repainting required to repair the results of any other improper use or excessive damage by the Tenant;
  - repairs and replacement required where windows are left open which have caused plumbing to freeze, or rain or water damage to floors or walls; and
  - replacing damaged or missing doors, windows, screens, mirrors or light fixtures;
  - any other repairs or cleaning due to any damage beyond normal wear and tear caused or permitted by the Tenant or by any person whom the Tenant is responsible for;
  - unplugging toilets, sinks and drains;
  - the cost of extermination where the Tenant or the Tenant's guests have brought or allowed insects into the Premises or building;
  - any other purpose allowed under this Lease or the Act.

For the purpose of this clause, the Landlord may charge the Tenant for professional cleaning and repairs if the Tenant has not made alternate arrangements with the Landlord.

- The Tenant may not use the Security Deposit as payment for the Rent.

- Within the lesser of Max days and any time period required by the Act after the termination of this tenancy, the Landlord will deliver or mail the Security Deposit less any proper deductions or with further demand for payment to: ~~Security Deposit Location~~, or at such other place as the Tenant may advise. Any refund may be paid to any of the Tenants.

## Noise and Disruptive Activities

- TENANT or his/her guests and invitees shall not disturb, annoy, endanger or inconvenience other tenants of the building, neighbors, the LANDLORD or his agents, or workmen nor violate any law, nor commit or permit waste or nuisance in or about the premises.

- The Landlord covenants that on paying the Rent and performing the covenants contained in this Lease, the Tenant will peacefully and quietly have, hold, and enjoy the Premises for the agreed term.

- TENANT shall not do or keep anything in or about the premises that will obstruct the public spaces available to other residents. Lounging or unnecessary loitering on the front steps, public balconies or the common hallways that interferes with the convenience of other residents is prohibited

## Inspections

- At all reasonable times during the term of this Lease and any renewal of this Lease, the Landlord and its agents may enter the Premises to make inspections or repairs, or to show the Premises to prospective tenants or purchasers in compliance with the Act.

## Signing Incentives

- The Landlord will give, make or perform the following signing incentives: n/a.

## Tenant Improvements

- The Tenant will obtain written permission from the Landlord before doing any of the following:
  - applying adhesive materials, or inserting nails or hooks in walls or ceilings other than two small picture hooks per wall;
  - painting, wallpapering, redecorating or in any way significantly altering the appearance of the Premises;
  - removing or adding walls, or performing any structural alterations;
  - installing a waterbed(s);
  - changing the amount of heat or power normally used on the Premises as well as installing additional electrical wiring or heating units;
  - placing or exposing or allowing to be placed or exposed anywhere inside or outside the Premises any placard, notice or sign for advertising or any other purpose; or
  - affixing to or erecting upon or near the Premises any radio or TV antenna or tower.

## Utilities and Other Charges

- The Tenant is responsible for the payment of the following utilities and other charges in relation to the Premises: PG&E , SmuD

  PG&E

## Insurance

- The Tenant is not responsible for insuring the Tenant's contents and furnishings in or about the Premises for either damage or loss, and the Tenant assumes no liability for any such loss.

- The Tenant is not responsible for insuring the Landlord's contents and furnishings in or about the Premises for either damage or loss, and the Tenant assumes no liability for any such loss.

- The Tenant is responsible for insuring the Premises for either damage or loss to the structure, mechanical or improvements to the building of the Premises, and the Tenant assumes liability for any such loss.

- The Tenant is responsible for insuring the Premises for liability insurance, and the Tenant assumes liability for any such loss.

## Abandonment

- If at any time during the term of this Lease, the Tenant abandons the Premises or any part of the Premises, the Landlord may, at its option, enter the Premises by any means without being liable for any prosecution for such entering, and without becoming liable to the Tenant for damages or for any payment of any kind whatever, and may, at the Landlord's discretion, as agent for the Tenant, rent the Premises, or any part of the Premises, for the whole or any part of the then unexpired term, and may receive and collect all rent payable by virtue of such renting, and, at the Landlord's option, hold the Tenant liable for any difference between the Rent that would have been payable under this Lease during the balance of the unexpired term, if this Lease had continued in force, and the net rent for such period realized by the Landlord by means of the renting. If the Landlord's right of re-entry is exercised following abandonment of the premises by the Tenant, then the Landlord may consider any personal property belonging to the Tenant and left on the Premises to also have been abandoned, in which case the Landlord may dispose of all such personal property in any manner the Landlord will deem proper and is relieved of all liability for doing so.

## Attorney Fees

- In the event that any action is filed in relation to this Lease, the unsuccessful party in the action will pay to the successful party, in addition to all the sums that either party may be called on to pay, a reasonable sum for the successful party's attorney fees.

## Governing Law

- It is the intention of the parties to this Lease that the tenancy created by this Lease and the performance under this Lease, and all suits and special proceedings under this Lease, be construed in accordance with and governed, to the exclusion of the law of any other forum, by the laws of the State of CA, without regard to the jurisdiction in which any action or special proceeding may be instituted.

## Severability

- If there is a conflict between any provision of this Lease and the applicable legislation of the State of CA (the 'Act'), the Act will prevail and such provisions of the Lease will be amended or deleted as necessary in order to comply with the Act. Further, any provisions that are required by the Act are incorporated into this Lease.

- If there is a conflict between any provision of this Lease and any form of lease prescribed by the Act, that prescribed form will prevail and such provisions of the lease will be amended or deleted as necessary in order to comply with that prescribed form. Further, any provisions that are required by that prescribed form are incorporated into this Lease.

- In the event that any of the provisions of this Lease will be held to be invalid or unenforceable in whole or in

part, those provisions to the extent enforceable and all other provisions will nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included in this Lease and the remaining provisions had been executed by both parties subsequent to the expungement of the invalid provision.

- If any provision of this agreement is held to be invalid, such invalidity shall not affect the validity or enforceability of any other provision of this agreement

## Amendment of Lease

- Any amendment or modification of this Lease or additional obligation assumed by either party in connection with this Lease will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

## Assignment and Subletting

- An assignment, subletting, concession, or license or an assignment or subletting by operation of law, will be void and will, at Landlord's option, terminate this Lease.

## Damage to Premises

- If the Premises, or any part of the Premises, will be partially damaged by fire or other casualty not due to the Tenant's negligence or willful act or that of the Tenant's employee, family, agent, or visitor, the Premises will be promptly repaired by the Landlord and there will be an abatement of rent corresponding with the time during which, and the extent to which, the Premises may have been unlivable. However, if the Premises should be damaged other than by the Tenant's negligence or willful act or that of the Tenant's employee, family, agent, or visitor and the Landlord decides not to rebuild or repair the Premises, the Landlord may end this Lease by giving appropriate notice.

## Maintenance

- The Tenant will, at its sole expense, keep and maintain the Premises and appurtenances in good and sanitary condition and repair during the term of this Lease and any renewal of this Lease.

- In particular, the Tenant will keep the fixtures in the Premises in good order and repair. The Tenant will, at Tenant's sole expense, make all required repairs to the plumbing, range, heating apparatus, and electric and gas fixtures whenever damage to such items will have resulted from the Tenant's misuse, waste, or neglect or that of the Tenant's employee, family, agent, or visitor.

- Major maintenance and repair of the Premises involving anticipated or actual costs in excess of $100.00 per incident not due to the Tenant's misuse, waste, or neglect or that of the Tenant's employee, family, agent, or visitor, will be the responsibility of the Landlord or the Landlord's assigns.

- Where the Premises has its own sidewalk, entrance, driveway or parking space which is for the exclusive use of the Tenant and its guests, the Tenant will keep the sidewalk, entrance, driveway or parking space clean, tidy and free of objectionable material including dirt, debris, snow and ice.

- Where the Premises has its own garden or grass area which is for the exclusive use of the Tenant and its guests, the Tenant will water, fertilize, weed, cut and otherwise maintain the garden or grass area in a reasonable condition including any trees or shrubs therein.

## Care and Use of Premises

- The Tenant will promptly notify the Landlord of any damage, or of any situation that may significantly interfere with the normal use of the Premises or to any furnishings supplied by the Landlord.

- Vehicles which the Landlord reasonably considers unsightly, noisy, dangerous, improperly insured, inoperable or unlicensed are not permitted in the Tenant's parking stall(s), and such vehicles may be towed away at the Tenant's expense. Parking facilities are provided at the Tenant's own risk. The Tenant is required to park in only the space allotted to them.

- The Tenant will not make (or allow to be made) any noise or nuisance which, in the reasonable opinion of the Landlord, disturbs the comfort or convenience of other tenants.

- The Tenant will keep the Premises reasonably clean.

- The Tenant will dispose of its trash in a timely, tidy, proper and sanitary manner.

- The Tenant will not engage in any illegal trade or activity on or about the Premises.

- The Landlord and Tenant will comply with standards of health, sanitation, fire, housing and safety as required by law.

- The Landlord will use reasonable efforts to maintain the Premises in such a condition as to prevent the accumulation of moisture and the growth of mold, and to promptly respond to any written notices from the Tenant in relations to accumulation of moisture and visible evidence of mold.

- The Tenant will use reasonable efforts to maintain the Premises in such a condition as to prevent the accumulation of moisture and the growth of mold, and to promptly notify the Landlord in writing of any moisture accumulation that occurs or of any visible evidence of mold discovered by the Tenant.

- The Tenant agrees that no signs will be placed or painting done on or about the Premises by the Tenant or at the Tenant's direction without the prior, express, and written consent of the Landlord. Notwithstanding the above provision, the Tenant may place election signs on the Premises during the appropriate time periods.

- If the Tenant is absent from the Premises and the Premises are unoccupied for a period of four consecutive days or longer, the Tenant will arrange for regular inspection by a competent person. The Landlord will be notified in advance as to the name, address and phone number of this said person.

- The hallways, passages and stairs of the building in which the Premises are situated will be used for no purpose other than going to and from the Premises and the Tenant will not in any way encumber those areas with boxes, furniture or other material or place or leave rubbish in those areas and other areas used in common with any other tenant.

- Boots and rubbers which are soiled or wet should be removed at the entrance to the building in which the Premises are located and taken into the Tenant's Premises.

- At the expiration of the lease term, the Tenant will quit and surrender the Premises in as good a state and condition as they were at the commencement of this Lease, reasonable use and wear and damages by the elements excepted.

## Hazardous Materials

- The Tenant will not keep or have on the Premises any article or thing of a dangerous, flammable, or explosive character that might unreasonably increase the danger of fire on the Premises or that might be considered hazardous by any responsible insurance company.

## Rules and Regulations

- The Tenant will obey all rules and regulations posted by the Landlord regarding the use and care of the

building, parking lot, laundry room and other common facilities that are provided for the use of the Tenant in and around the building containing the Premises.

## Lead Warning / N/A

- Housing built before 1978 may contain lead based paint. Lead from paint, paint chips, and dust can pose health hazards if not taken care of properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

## General Provisions

- Any waiver by the Landlord of any failure by the Tenant to perform or observe the provisions of this Lease will not operate as a waiver of the Landlord's rights under this Lease in respect of any subsequent defaults, breaches or non-performance and will not defeat or affect in any way the Landlord's rights in respect of any subsequent default or breach.

- This Lease will extend to and be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors and assigns, as the case may be, of each party to this Lease. All covenants are to be construed as conditions of this Lease.

- All sums payable by the Tenant to the Landlord pursuant to any provision of this Lease will be deemed to be additional rent and will be recovered by the Landlord as rental arrears.

- Where there is more than one Tenant executing this Lease, all Tenants are jointly and severally liable for each other's acts, omissions and liabilities pursuant to this Lease.

- Locks may not be added or changed without the prior written agreement of both the Landlord and the Tenant, or unless the changes are made in compliance with the Act.

- The Tenant will be charged an additional amount of $25.00 for each N.S.F. check or check returned by the Tenant's financial institution.

- The Tenant will professionally steam clean the carpets on a yearly and at the termination of this Lease or the Landlord may charge the Tenant or deduct the cost of having the carpets professionally steam cleaned from the security deposit.

- Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Lease. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

- This Lease and the Tenant's leasehold interest under this Lease are and will be subject, subordinate, and inferior to any liens or encumbrances now or hereafter placed on the Premises by the Landlord, all advances made under any such liens or encumbrances, the interest payable on any such liens or encumbrances, and any and all renewals or extensions such liens or encumbrances.

- This Lease may be executed in counterparts. Facsimile signatures are binding and are considered to be original signatures.

- Time is of the essence in this Lease.

- This Lease will constitute the entire agreement between the Landlord and the Tenant. Any prior understanding or representation of any kind preceding the date of this Lease will not be binding on either party except to the extent incorporated in this Lease.

- The Tenant will indemnify and save the Landlord, and the owner of the Premises where different from the Landlord, harmless from all liabilities, fines, suits, claims, demands and actions of any kind or nature for which the Landlord will or may become liable or suffer by reason of any breach, violation or non-performance by the Tenant or by any person for whom the Tenant is responsible, of any covenant, term, provisions hereof or by reason of any act, neglect or default on the part of the Tenant or other person for whom the Tenant is responsible. Such indemnification in respect of any such breach, violation or non-performance, damage to property, injury or death occurring during the term of the Lease will survive the termination of the Lease, notwithstanding anything in this Lease to the contrary.

- The Tenant agrees that the Landlord will not be liable or responsible in any way for any personal injury or death that may be suffered or sustained by the Tenant or by any person for whom the Tenant is responsible who may be on the Premises of the Landlord or for any loss of or damage or injury to any property, including cars and contents thereof belonging to the Tenant or to any other person for whom the Tenant is responsible.

- The Tenant is responsible for any person or persons who are upon the or occupying the Premises or any other part of the Landlord's premises at the request of the Tenant, either express or implied, whether for the purposes of visiting the Tenant, making deliveries, repairs or attending upon the Premises for any other reason. Without limiting the generality of the foregoing, the Tenant is responsible for all members of the Tenant's family, guests, servants, tradesmen, repairmen, employees, agents, invitees or other similar persons.

- During the last 30 days of this Lease, the Landlord or the Landlord's agents will have the privilege of displaying the usual 'For Sale' or 'For Rent' or 'Vacancy' signs on the Premises.
- The lease is subject to all rules, regulations and bylaws of any applicable Condominium and/or Home Owner Associations.

IN WITNESS WHEREOF Leatha Henderson, Sondra Madden have duly affixed their signatures on this
_____(date).

Witness:

_Leatha B Henderson_

Leatha Henderson                                          5/1/2010
                                                                              date

Witness:

_Sondra Madden_

Sondra Madden                                            5/1/2010
                                                                              date

Witness:

_Dale Madden_

Dale Madden                                              5/1/2010
                                                                              date